MARC J. FAGEL (admitted in CA)
MICHAEL S. DICKE (admitted in CA)
SHEILA E. O'CALLAGHAN (admitted in CA)
  ocallaghans@sec.gov
ROBERT S. LEACH (admitted in CA)
  leachr@sec.gov
JEREMY E. PENDREY (admitted in CA)
  pendreyj@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

### SPOKANE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. CV-11-345-RMP |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| DORIS E. NELSON, | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY OF THE ACTION

1.      From 1999 to 2008, defendant Doris E. Nelson raised approximately $135 million from at least 650 investors in the United States, Canada, and Mexico. Nelson misrepresented to investors that the money would be used to grow "Little Loan Shoppe," a payday loan business she owned and controlled. She told investors

COMPLAINT
SEC v. Nelson

that Little Loan Shoppe was financially sound, promising them that they would earn 40-60% annual returns from the company's profits. In reality, Little Loan Shoppe was a failing business. Far from generating substantial profits, Little Loan Shoppe did not earn enough money to repay investor's principal, much less the huge returns she promised them. Nelson instead ran the enterprise as a massive Ponzi scheme, using the vast majority of new investor money to repay principal and purported "interest" to earlier investors. She also misappropriated millions of dollars from investors, spending it on, among other things, home improvement projects, a Mercedes, a Corvette for her husband, and gambling jaunts to Las Vegas.

2.      In mid-2008, as Little Loan Shoppe rapidly approached implosion while owing massive sums to investors, Nelson made a last-ditch effort to raise even more money, telling investors that Little Loan Shoppe had "defied financial gravity" by continuing to grow in the declining economy. Investors responded, investing tens of millions of dollars in 2008, just before the scheme finally collapsed in 2009, when payments to investors ceased and Little Loan Shoppe was forced into bankruptcy.

3.      Nelson violated the antifraud and other provisions of the federal securities laws. The Commission seeks to enjoin Nelson from further violations of the securities laws, disgorgement of her ill-gotten gains, and payment of civil money penalties.

## JURISDICTION AND VENUE

4.      The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

5.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d)(3), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(e), and 78aa]. Nelson, directly or

1  indirectly, has made use of the means and instrumentalities of interstate commerce

2  or of the mails in connection with the acts, transactions, practices, and courses of

3  business alleged in this complaint.

4      6.      Venue in this District is proper pursuant to Section 22 of the Securities

5  Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]

6  because a substantial portion of the conduct alleged in this complaint occurred

7  within the Eastern District of Washington.

8                            **DEFENDANT**

9      7.      Defendant Doris E. "Dee" Nelson, age 51, resides in Colbert,

10  Washington.  At all relevant times, Nelson owned and controlled the entities

11  comprising Little Loan Shoppe.  In testimony before the Commission, Nelson

12  asserted her Fifth Amendment privilege against self-incrimination in response to

13  questions regarding Little Loan Shoppe and her investment-raising activities.

14                        **RELATED ENTITIES**

15      8.      Little Loan Shoppe ("LLS") consisted of at least the following entities:

16  Little Loan Shoppe Ltd., Little Loan Shoppe America, LLC, Team Spirit America,

17  LLC, 639504 BC, Ltd., Little Loan Shoppe Canada, LLC, 0738106 BC, Ltd.,

18  0738116 BC, Ltd., 0738126 BC, Ltd., LLS America, LLC, LLS Canada, LLC, LLS-

19  A, LLC (WA), Pacific LLS, LLC, Atlantic LLS, LLC, Eastern LLS, LLC, Central

20  LLS, LLC, LLS-A, LLC (NV), LLS-NW, LLC, and LLS-US, LLC.  Nelson and

21  LLS' employees operated the LLS entities in connection with a payday loan

22  company, which is a business that provides short-term high-interest loans to

23  individuals who want money for expenses until they receive their next paycheck.

24

25

26

27

28

COMPLAINT                    -3-        SECURITIES AND EXCHANGE COMMISSION
SEC v. Nelson                            44 MONTGOMERY STREET, SUITE 2600
                                         SAN FRANCISCO, CA 94104

## FACTUAL ALLEGATIONS

### Nelson Owned and Controlled the Little Loan Shoppe

9.     In 1997, Nelson started LLS in British Columbia, Canada, where it offered short-term payday loans through storefronts.  In 2001, Nelson moved to Spokane, Washington, and relocated the business there.

10.    In approximately 2004, LLS began offering payday loans over the Internet.  In 2006, Nelson closed her LLS storefronts.  Afterward, she operated LLS' payday loan business exclusively over the Internet.

11.    In May 2006, Nelson incorporated Team Spirit America, LLC ("Team Spirit"), which conducted operations for the LLS entities.

12.    Nelson owned each of the LLS entities, including Team Spirit.  Except for March to October 2009, Nelson was Chief Executive Officer of LLS.  As CEO, Nelson controlled the LLS entities.  Even during the months Nelson was not LLS' CEO, Nelson stayed in contact with management about LLS' operations, and she continued to own LLS during that time period.

### Through Misrepresentations About LLS' Profitability and the Safety of the Investments, Nelson Raised Approximately $135 Million from Investors

13.    Since approximately 1999, Nelson has issued hundreds, if not thousands, of promissory notes to more than 650 investors primarily in the United States, Canada, and Mexico (the "LLS Notes").  The LLS Notes obligated Nelson personally and/or one or more of several LLS entities to pay investors 40-60% annual interest.  LLS entities that issued the LLS Notes include, but are not limited to:  LLS-A, LLC, Little Loan Shoppe America, LLC, The Little Loan Shoppe Canada, LLC, 0738126 BC Ltd., and Central LLS, LLC.  Nelson signed each of the LLS Notes.  The LLS Notes were offered and issued continuously from 1999 to 2008.  The LLS entities did not file any registration statement with the Commission registering the offer of securities.

14.     Early in the scheme, the LLS Notes were typically for a term of one or two years, though Nelson later issued notes for terms of up to ten years. Through the LLS Notes, Nelson raised approximately $135 million from investors. Investors typically wired or mailed their investments to LLS. To pay their returns, Nelson often mailed, or caused to be mailed, investors several post-dated checks, which investors cashed on or after the dates on the checks.

15.     Nelson was the primary contact person for LLS investors. Throughout the offering of the LLS Notes, Nelson had many individual meetings and calls with investors to discuss the opportunity to invest in LLS. Once LLS was located in Spokane, Nelson had many meetings with investor's at LLS' Spokane headquarters. Nelson orally promised many investors that she would use their money to grow LLS' payday loan business. She did not tell investors she would instead use their money to pay back other investors. As described below, she also misrepresented the financial condition of the company, falsely telling investors that the company was financially sound.

16.     Nelson also misrepresented the safety of investments in LLS. In meetings and telephone conversations, Nelson told many investors that the investments were safe and risk free. She told at least one investor that the investments were covered by a life insurance policy in the event of her death. In 2006, that investor sent an email to additional investors describing Nelson's statements. In the summer of 2007, she told two investors during a dinner meeting that she had a separate account to repay investors if the economy slowed down. In one meeting in her office with an investor, Nelson said there was no way for the business to go under and that it was doing better in a difficult economy than before.

17.     Nelson knew, or was reckless in not knowing, that her representations to investors that their investments were safe and risk free were false. In particular, Nelson knew, or was reckless in not knowing, that no insurance policy existed to insure investors against the loss of their investments in LLS, no collateral or fund

COMPLAINT
SEC v. Nelson
-5-
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104

1  existed to protect investors, and Nelson's guarantees of a safe and risk-free

2  investment had no basis.

3      18.    Nelson knew, or was reckless in not knowing, that her representations

4  to investors that LLS' business was financially sound were false. From 1999

5  through 2008, LLS failed to generate income from operations to fund payments to

6  investors. The only source of funds available for payments to investors was the

7  money raised from investors. Nelson was LLS' CEO throughout this time and had

8  full visibility into its finances. During this time, Nelson knew, or was reckless in not

9  knowing, that LLS' debt to investors had grown by tens of millions of dollars, far

10  beyond the means of LLS to repay it.

11      19.    Nelson knew, or was reckless in not knowing, that her representations

12  to investors that LLS would use the money raised to make payday loans to

13  customers were false. On an ongoing basis, when LLS needed money to repay

14  amounts due to investors, Nelson contacted investors, or directed lower level

15  employees to contact investors, to raise additional funds. Once the funds were

16  raised, Nelson transferred, or directed employees to transfer, the funds to investors

17  to whom LLS owed payments. Thus, Nelson knew, or was reckless in not knowing,

18  that LLS was operating a Ponzi scheme, not growing its business.

19      **Examples of Nelson's Misrepresentations To Particular Investors**

20      20.    One LLS investor from New Hampshire met with Nelson in June 2008.

21  The investor had previously invested in LLS and was considering investing

22  additional funds. During the meeting, Nelson pushed the investor to invest

23  additional funds. Nelson told the investor that LLS had reached explosive growth

24  and had great opportunities. Nelson promised the investor that she would personally

25  guarantee the investment.

26      21.    At the meeting, the New Hampshire investor asked Nelson if the funds

27  would be used for anything other than the LLS business, and Nelson said the only

28  purpose for the funds would be to fund the payday loan business. Nelson told the

COMPLAINT                              -6-     SECURITIES AND EXCHANGE COMMISSION
SEC v. Nelson                                  44 MONTGOMERY STREET, SUITE 2600
                                               SAN FRANCISCO, CA 94104

1  investor that LLS's revenue exceeded the high returns she was paying and allowed
2  her to pay such high returns. Based on his meeting with Nelson, in July 2008, he
3  invested an additional $500,000 in LLS.

4      22.    The investor invested a total of $1.75 million in LLS. He received
5  about $600,000 in repayments before LLS checks bounced and became worthless.

6      23.    An investor from Washington talked to Nelson a number of times in
7  2008 before investing. Nelson said LLS was going great, and it was expanding.
8  Nelson said it was a safe investment, and that he would not be sorry if he invested.
9  Nelson told the investor she was only letting in a few more investors before she
10  closed the investment opportunity. The investor told Nelson he and his wife were
11  going to borrow money to make the investment. Nelson said the investment was
12  perfectly safe and he would be happy he invested.

13      24.    Based on Nelson's representations, the Washington couple refinanced
14  their home and borrowed money to make the higher house payments for six months
15  until they were to receive returns on the LLS investment. They invested $100,000 in
16  LLS by wire transfer in mid-2008. In addition, the husband's 83-year old mother
17  invested $50,000.

18      25.    Before the Washington couple was supposed to receive their first LLS
19  payment, Nelson unilaterally reduced their interest rate to 10%. After receiving this
20  information, the investors contacted Nelson by email explaining that they needed the
21  money. The investor's wife had been diagnosed with cancer, which created
22  additional financial burdens for them. Nelson did not respond to their email.

23      26.    An investor from Georgia spoke with Nelson in 2007 before he and his
24  wife invested. He asked Nelson for LLS' financial statements, but Nelson did not
25  provide them and instead represented that LLS had $50 to $60 million on the books
26  and that there was plenty of money. Nelson told the investor that the funds were
27  100% safe and completely collateralized by loans in the marketplace.

28

27.    Based on Nelson's representations, the Georgia couple invested three times between November 2007 and March 2008, with the investments totaling $135,000. The investment was their retirement savings. The investors have also been out of work and are concerned about losing their home.

**After Luring Investors with Misrepresentations, Nelson Misappropriated Investor Funds**

28.    None of Nelson's representations described above were true. LLS was never profitable, and thus never generated the money to cover payments owed investors. And Nelson did not spend the bulk of investors' money to make payday loans to grow the business. Nelson instead spent the vast majority of investors' money making Ponzi payments of principal and "interest" to earlier investors. The investments were never insured, guaranteed, or collateralized.

29.    When LLS periodically became low on cash, Nelson directed lower level employees to contact investors to request that they invest additional money in LLS. Once those investments were obtained, Nelson directed employees to use the money to pay "interest" to other investors. On multiple occasions, investor money came into an account for one LLS entity and Nelson directed employees to transfer the money to a different LLS entity so that it could be paid to another investor.

30.    Nelson misappropriated millions of dollars in investor funds for her personal use, including buying a new Corvette for her husband and a Mercedes for herself. Nelson misappropriated investors funds to, among other things, purchase and fix up her home, start businesses for family members, and for gambling trips to Las Vegas.

**When the Scheme Approached Collapse, Nelson Obtained Substantial Additional Investments by Misrepresenting LLS' Financial Condition**

31.    Starting in early 2008, Nelson sent out emails encouraging investors to invest additional money in LLS. In those emails, Nelson made numerous misrepresentations to investors. In February 2008, Nelson told investors that last

year LLS "experienced substantial growth in an otherwise declining economy. In short, we defied financial gravity." She also forecast "an explosion of profit." In fact, LLS' revenue came nowhere close to servicing the tens of millions of dollars of principal and interest owed investors. The company was not growing, but was rather falling further into debt as it raised more money from investors, and continued to lose money on its payday loan operations.

32.    In February 2008, Nelson also announced the creation of a company that would generate customer leads for LLS, claiming that it would convert "what used to be a massive expense into pure profit." At the time, LLS was buying customer leads from third-party vendors. In March 2008, Nelson said that "due to recent growth" and the new entity she created to generate customer leads, LLS was "busy as ever!" and ready to receive investments. In truth, LLS was not generating enough of its own customer leads to avoid having to continue buying leads, which remained a significant expense.

33.    In May 2008, Nelson emailed investors again telling them that LLS would be accepting new investments. She also reassured investors that the payday loan industry was thriving, and that the economic downturn actually benefited LLS. The next day, she sent an email announcing a "window to invest," explaining that the opportunity was due to the new lead-generating entity, and telling investors that the window could close and would likely not be open again.

34.    In July 2008, as LLS ran out of cash, Nelson offered investors a new payment plan in which investors would receive payments at 60% annual interest rates paid every twenty months instead of more frequent payments under existing plans, which typically paid investors 40% annual interest rates, with payments monthly. Nelson's promises to pay investors 60% annual interest were false because, in truth, LLS was not profitable and had no ability to pay investors.

35.    Investors responded to Nelson's call for additional investments, and invested tens of millions in 2008. But LLS still ran out of money.

36.     Nelson knew, or was reckless in not knowing, that her representations in 2008 about LLS were false.  For example, when Nelson told investors that LLS had "defied financial gravity" she knew, or was reckless in not knowing, that LLS' debt to investors had ballooned far beyond its ability to repay investors, and that rather than defying gravity, LLS was getting deeper into debt.  Similarly, when Nelson told investors there was a "window to invest" open that would close soon and was not likely to be open again, Nelson knew, or was reckless in not knowing, that no such "window" existed; she was simply attempting to induce investors to invest more money in LLS so that she could keep it operating in the face of growing debt to investors and a failure to generate profits.  Thus, though Nelson attempted to portray LLS as a growing, successful business, in fact, she knew or was reckless in not knowing, that it was on the verge of collapse.

### The Scheme's Collapse

37.     In October 2008, Nelson unilaterally reduced all investor interest rates to 10%.  And she conceded that the lower rate would remain in place until LLS returned to a "stable and positive financial condition."

38.     In March 2009, LLS ceased all payments to investors.

39.     In July 2009, LLS America, LLC filed a petition in Las Vegas, Nevada for Chapter 11 bankruptcy.  Also in July 2009, investors forced LLS-A, LLC into involuntary Chapter 11 bankruptcy proceedings in Spokane, Washington.  The LLS America, LLC and LLS-A, LLC bankruptcies have been consolidated in Spokane, Washington.

40.     Of the approximately $135 million raised, LLS paid investors more than $115 million.  But some investors were paid back their principal plus purported profits, while others lost substantial principal.  In total, investors lost tens of millions of dollars of their principal investments.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

41.    The Commission incorporates and realleges here paragraphs 1 through 40, above.

42.    Nelson has, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

43.    By reason of the foregoing, Nelson has directly or indirectly violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### (Violations of Securities Act Section 17(a)(1))

44.    The Commission incorporates and realleges here paragraphs 1 through 40, above.

45.    By engaging in the conduct described above, Nelson, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes or artifices to defraud.

46.    By reason of the foregoing, Nelson violated, and unless restrained and enjoined will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### THIRD CLAIM FOR RELIEF

**(Violations of Securities Act
Sections 17(a)(2) and (3))**

47.    The Commission incorporates and realleges here paragraphs 1 through 40, above.

48.    By engaging in the conduct described above, Nelson, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

49.    By reason of the foregoing, Nelson violated, and unless restrained and enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

### FOURTH CLAIM FOR RELIEF

**(Violations of Securities Act
Sections 5(a) and 5(c))**

50.    The Commission incorporates and realleges here paragraphs 1 through 40, above.

51.    During the relevant period, Nelson, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no valid registration statement had been filed or was

1  in effect as to such offers and sales of such securities and no exemption from

2  registration was available.

3      52.    Nelson engaged in or participated in the unlawful distribution of LLS

4  securities as described above.

5      53.    By reason of the foregoing, Nelson, directly or indirectly, violated, and

6  unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act

7  [15 U.S.C. §§ 77e(a) and 77e(c)].

8                        **PRAYER FOR RELIEF**

9      WHEREFORE, the Commission respectfully requests that the Court:

10                              I.

11     Permanently enjoin and restrain Nelson from, directly or indirectly, engaging

12  in conduct in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act [15

13  U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C.

14  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

15                              II.

16     Order Nelson to provide an accounting and to disgorge her ill-gotten gains in

17  an amount according to proof, plus prejudgment interest thereon.

18                              III.

19     Order Nelson to pay civil money penalties pursuant to Section 20(d) of the

20  Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15

21  U.S.C. § 78u(d)].

22                              IV.

23     Retain jurisdiction of this action in accordance with the principles of equity

24  and the Federal Rules of Civil Procedure in order to implement and carry out the

25  terms of all orders and decrees that may be entered, or to entertain any suitable

26  application or motion for additional relief within the jurisdiction of this Court.

27

28

V.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated:  September 22, 2011          Respectfully submitted,


/s/ Jeremy E. Pendrey
Jeremy E. Pendrey
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION